554 December 11, 2019 No. 25

IN THE OREGON TAX COURT
REGULAR DIVISION

Ariel PETERSON,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant.*

(TC 5329)

Plaintiff (taxpayer) made a motion to stay prelitigation payment of her assessed personal income tax based on undue hardship pursuant to ORS 305.419(3). The court, after considering the text, context, and legislative history of ORS 305.419(3), interpreted its ability to grant relief due to "undue hardship." The court found inconsistencies between taxpayer's affidavits to the court and documents she filed with the Internal Revenue Service regarding income or money owed. The court held that taxpayer did not prove that immediate payment of her assessed personal income tax would constitute undue hardship. This opinion should be read together with the court's opinion in *Lamka v. Dept. of Rev.*, 23 OTR 566 (2019).

Submitted on Plaintiff's Motion for Stay of Payment of Income Tax, Penalties, and Interest.

John Stuart Jones, Attorney at Law, Salem, filed the motion for Plaintiff.

James C. Wallace, Senior Assistant Attorney General, Department of Justice, Salem, filed a response for Defendant Department of Revenue.

Decision for Defendant rendered December 11, 2019.

**ROBERT T. MANICKE, Judge.**

## I. INTRODUCTION

This matter is before the court on a motion by Plaintiff Ariel Peterson (taxpayer) to stay payment of personal income tax pursuant to ORS 305.419(3).[1] Taxpayer filed a supporting affidavit concurrently with her complaint appealing from an adverse decision in the Magistrate Division, where taxpayer challenged assessed deficiencies

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

in personal income tax for tax year 2013 that Defendant Department of Revenue (the department) asserts totaled somewhat more than $46,000 as of July 2018. The department initially objected and, after substantial discovery and supplemental filings by both parties, continues to object to a finding of undue hardship.

This opinion should be read together with the court's opinion in *Lamka v. Dept. of Rev.*, 23 OTR 566 (2019), issued this day. Plaintiff in that case, Peter E. Lamka, had business dealings with taxpayer that the department alleges taxpayer must clarify before the court can determine the credibility of taxpayer's allegations supporting her claim of undue hardship.

## II.  ISSUE

Has taxpayer carried her burden of proving that immediate payment of the personal income tax, interest, and penalties assessed would be an undue hardship?

## III.  BACKGROUND

ORS 305.419(1) generally requires payment of any asserted deficiency of net income tax, along with any penalties and interest, on or before the filing of a complaint in this division of the court. However, ORS 305.419(3) provides:

> "Where payment of the tax, penalty and interest would be an *undue hardship*, plaintiff may file an affidavit alleging undue hardship within the time described in subsection (1) of this section. \*\*\* If the tax court finds undue hardship, the tax court judge may stay all or any part of the payment of tax, penalty and interest required under subsection (1) of this section. If the tax court judge finds no undue hardship, the tax court judge may grant the plaintiff up to 30 days from the date of determination to pay the tax, penalty and interest. Failure by the plaintiff to pay the tax, penalty and interest or to establish undue hardship will be cause for dismissing the complaint."

ORS 305.419(3) (emphasis added). Neither this court nor the Oregon Supreme Court has articulated a definition or standards for the application of the statute. Accordingly, this order first considers the meaning of the key phrase "undue hardship," then examines whether taxpayer's initial

affidavit supports a conclusion of undue hardship. Finally, the court considers the department's objections and taxpayer's filings in response.

## IV.   ANALYSIS

A.   *Text*

The court starts by reviewing the text of the law, its context, and its relevant legislative history, to determine the meaning of "undue hardship." *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The tax statutes do not define the phrase; accordingly, the court reviews dictionary definitions as evidence of plain meaning. *See, e.g.*, *Hodges v. Oak Tree Realtors, Inc.*, 363 Or 601, 608, 426 P3d 82 (2018). The phrase was part of the original version of ORS 305.419, enacted in 1982. *See* Or Laws 1982, ch 29, § 2 (HB 3314). That version of subsection (3) provided:

> "Upon a showing of undue hardship by the plaintiff, the tax court may stay all or any part of the payment of tax, penalty and interest required under subsection (1) of this section."

The legislature amended ORS 305.419 in 1985, replacing the entire text of subsection (3) with the following:

> "Where payment of the tax, penalties and interest would be an undue hardship, plaintiff may file an affidavit alleging undue hardship with the complaint. If the tax court finds undue hardship, it may stay all or any part of the payment of tax, penalty and interest required under subsection (1) of this section. If the tax court finds no undue hardship, it may grant the plaintiff up to 30 days from the date of determination to pay the taxes, penalties and interest. Failure by the plaintiff to pay the taxes, penalties and interest or to establish undue hardship will be cause for dismissing the complaint."

Or Laws 1985, ch 407, § 1. Neither the 1985 amendment nor any later amendments have changed the phrase "undue hardship," nor has any version of the statute defined the phrase. The court thus looks to dictionary definitions. *Webster's Third New International Dictionary* does not define the phrase as a whole. It defines "hardship" as "something that causes or entails suffering or privation." *Webster's Third*

*New Int'l Dictionary* 1033 (unabridged ed 2002). "Suffering" is defined as "1: the state or experience of one who suffers: the endurance of or submission to affliction, pain, loss 2: a pain endured or a distress, loss, or injury incurred." *Webster's* at 2284. "Privation" is defined as "a condition characterized by the loss of something previously or normally possessed." *Id*. at 1805. The word "undue" (apart from its meaning in the context of a debt that is not yet "due") is defined as "unsuited to the time, place, or occasion" or "exceeding or violating propriety or fitness," with synonyms for the latter definition given as "excessive, immoderate, unwarranted." *Id*. at 2492. Similarly, the contemporaneous edition of *Black's Law Dictionary* includes no definition of "undue hardship" but defines "hardship" as "In general, privation, suffering, adversity." *Black's Law Dictionary* 646 (5th ed 1979). *Black's* adds: "As used in zoning statutes as grounds for variance, ["hardship"] refers to the fact that zoning ordinance or restriction as applied to a particular property is unduly oppressive, arbitrary, or confiscatory." *Id*. *Black's* defines "undue" as "More than necessary; not proper; illegal. It denotes something wrong, according to the standard of morals which the law enforces in relations of men, and in fact illegal * * *." *Id.* at 1370. From these definitions, the court concludes that the plain meaning of "undue hardship" is a loss that involves pain, distress, or injury that is excessive, unwarranted, or arbitrary.

## B.   *Context*

The court turns to the context of the "undue hardship" requirement. The court has found no Oregon statutes or administrative rules in existence in 1982 or 1985 that define the term.[2] Nor has the court found contemporaneous Oregon cases articulating specific factors or criteria for a finding of undue hardship in settings involving individuals and purely financial conditions; the limited case law at that

---

[2] *Cf., e.g.*, *former* ORS 10.050(1) (1985) (allowing excuse from jury service "upon a showing of undue hardship or extreme inconvenience to the person, the person's family, the person's employer or the public served by the person"); *former* ORS 135.050(1)(d) (allowing court-appointed attorney if, among other criteria, "defendant is financially unable to retain adequate representation without substantial hardship in providing necessities to the defendant or the defendant's family").

time involved substantial nonfinancial issues such as family law or liberty interests.[3]

Although Oregon income tax law does not generally incorporate procedural provisions of federal income tax law,[4] the court here considers for context any federal tax law definition of the term that might have existed in 1982 or 1985. Section 6161(b)(1) of the Internal Revenue Code allows the Secretary of the Treasury, "[u]nder regulations prescribed by the Secretary," to extend the time to pay an income tax deficiency "only where it is shown to the satisfaction of the Secretary * * * that the payment of a deficiency upon the date fixed for the payment thereof will result in undue hardship to the taxpayer * * *." That language was in place in 1982 and 1985. *See* Internal Revenue Code of 1954, § 6161(b) ("An extension under this subsection may be granted only where it is shown to the satisfaction of the Secretary or his delegate that the payment of a deficiency upon the date fixed for the payment thereof will result in undue hardship * * *."). A corresponding federal Treasury regulation, also in place at that time, states:

> "The term 'undue hardship' means more than an inconvenience to the taxpayer. It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer from making payment on the due date of the amount with respect to which the extension is desired. If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship."

Treas Reg § 1.6161-1(b); *see* Treasury Decision 6364 (Feb 13, 1959) (adopting quoted text). This context, though limited, indicates that the Internal Revenue Service required a taxpayer to show "substantial" financial loss in order to defer payment of an income tax deficiency. Having to sell property to pay the tax would not suffice, unless there was no market

---

[3] *Cf. Grove and Grove*, 280 Or 341, 353, 571 P2d 477 (1977) (articulating avoidance of "undue hardship" as one criterion to determine amount of spousal support to award in divorce cases); *State v. Gordon*, 43 Or App 511, 603 P2d 1196 (1979) (applying *former* ORS 130.050(1) (1985)).

[4] *See Allison v. Dept. of Rev.*, 11 OTR 431, 434-35 (1990) ("Oregon has its own administrative provisions * * *.").

for the property and the taxpayer had to sell the property at a "sacrifice price."

Federal bankruptcy law in place in 1982 and 1985 required courts to determine whether to discharge an individual debtor from student loan debt based on an "undue hardship on the debtor and the debtor's dependents." 11 USC § 523(a)(8)(B). Courts often looked for guidance to a 1973 Congressional report, which suggested that courts consider whether, upon review of present and anticipated earnings and unearned income or wealth, the debtor and dependents could "maintain *** a minimal standard of living within their management capability, as well as *** pay the educational debt." Communication from the Executive Director, Commission on the Bankruptcy Laws of the United States, HR Doc No 93-137, 93d Cong, 1st Sess, Pt II at 140-41 (1973); *see also In re Bagley*, 4 BR 248, 6 BCD 404, 405 (D Ariz 1980).

Based on this review of materials available to the Oregon legislature in 1982 and 1985, the court concludes that the Oregon legislature was aware of a range of circumstances that might constitute an undue hardship, from inability to maintain a minimal standard of living, to the excessive loss caused by having to sell property at a distress sale price.

C.  *Legislative History*

The court turns to a review of the legislative history of the 1982 and 1985 statutes. The court has found nothing from which it can infer any standards for the court to apply. In fact, the department's representative at the 1982 special session House Revenue Committee hearings, Elizabeth Stockdale,[5] testified that "there are no standards in the bill to guide the court in determining whether there is an undue hardship, so the court's going to have freedom and discretion to look at all the circumstances that affect that particular taxpayer and make a determination on those facts ***." Tape Recording, House Committee on Revenue, HB 3314, Feb 18, 1982, Tape 46, Side B, (testimony of Elizabeth

---

[5] Stockdale represented the department as an attorney for the Department of Justice and later became the department's director.

Stockdale).[6] The 1982 bill was one of a set of budgetary proposals that Governor Atiyeh asked the legislature to consider in a special session to address a projected state budget shortfall of $99.8 million. *Id.*, Tape 46, Side A (testimony of Jon Yunker, State Budget Director). Much of the discussion and testimony about the tax prepayment proposal involved the amount of revenue that would be recovered on an accelerated basis by requiring taxpayers to pay the assessment at the beginning of litigation in this court, as opposed to only at the end of unsuccessful litigation, including appeal to the Oregon Supreme Court. The accelerated revenue amounted to about $8 million, or about eight percent of the Governor's total proposal. *See id.*, Tape 46, Sides A & B. The chair of the House Revenue Committee expressed concern about the potential to chill a taxpayer's appeal rights and asked Stockdale whether a prepayment requirement would be constitutional. *Id.*, Tape 46, Side B. Stockdale responded that a body of case law from other states supported the validity of the requirement. *Id.* One senator inquired about taxpayers' ability to claim hardship relief solely to delay payment or to manipulate the then-existing interest rate difference as between tax refunds and tax assessments, and asked whether a mechanism could be devised to reduce that risk. Stockdale responded that devising such a mechanism would be difficult. *Id.*, Tape 31, Side A; Tape 30, Side B.

The 1985 replacement of ORS 305.419(3) apparently arose because Tax Court Judge Carl Byers observed that the 1982 provision arguably required the court to determine whether an undue hardship existed before a taxpayer's complaint could be filed. Given the short deadlines to file a tax complaint, Judge Byers was concerned that even a brief time for court review could jeopardize the timeliness of otherwise timely complaints. He therefore drafted new suggested language for subsection (3), which ultimately became the only surviving portion of a larger procedural bill. Tape Recording, Senate Committee on Revenue and School Finance, SB 186, May 1, 1985, Tape 163, Side A, (testimony of Hon Carl Byers); *see* Or Laws 1985, ch 407, § 1; SB 186.

---

[6] Stockdale was responding to a comment by the Chair of the House Revenue Committee that "I don't know what standards a court would apply" to determine a hardship. *Id.* (statement of Rep Powell).

The legislative history of the 1985 bill restating the phrase "undue hardship" gives no indication that the legislature intended to change the meaning of the phrase or to add any standards. In fact, Judge Byers testified that taxpayers generally do not know what constitutes an undue hardship. *See* Senate Committee on Revenue and School Finance, SB 186, May 1, 1985, Tape 163, Side A. A business lobbyist urged the committee to reverse course and eliminate the prepayment requirement altogether, noting that the immediate fiscal crisis that prompted the 1982 requirement had passed. There was minimal discussion of the consequences of thus "re-deferring" revenue, and no legislator proposed an amendment to do so. *Id.* (statement of Gary Carlson, Associated Oregon Industries).

Based on its review of the text, context, and legislative history of ORS 305.419(3), the court concludes that the legislature in 1982 and 1985 viewed the prepayment requirement as an important source of immediate revenue, any undoing of which would incur at least a short-term cost. The legislature decided to create only one basis for relief from the prepayment requirement, and to vest the court with discretion to administer that relief. Although the legislature adopted the undue hardship criterion without any stated standard, the court infers from the text and context of the law that the legislature certainly intended the court to grant hardship relief where immediate payment of the tax would prevent a taxpayer from maintaining a minimal standard of living. Furthermore, the legislature authorized the court to consider other potential factors, such as an excessive, permanent loss that would be caused when a taxpayer would have to sell off property at a distress sale price. Implicitly, by using the word "undue," the legislature also authorized the court to weigh the public policy of ensuring public access to an appeal against the public benefit of an immediate collection (and elimination of the corresponding risk of abuse by taxpayers seeking primarily to delay).

D.   *Taxpayer's Affidavit and Supplemental Sworn Statements*

The court turns to taxpayer's first affidavit, which she signed on June 8, 2018, by answering questions on a form provided by the court ("June 8 Statement"). Under

penalty of perjury, taxpayer declared net monthly wages in a modest amount and no other source of income. She had minimal cash on hand and an older vehicle on which she owed more than the value. She had no other property. In response to the question "Money Owed to You by Others," taxpayer wrote "N/A." Her living expenses, including rent or mortgage payments and vehicle payments added up to almost exactly the amount of her wages, after taxes. Solely based on a review of the June 8 Statement, the court likely would conclude that enforcing the prepayment requirement would work an undue hardship on taxpayer. However, the department has objected to taxpayer's motion and has taken extensive discovery, prompting taxpayer to file supplemental declarations or affidavits supporting her motions.

On June 25, 2018, taxpayer signed a Supplemental Affidavit ("June 25 Statement"). She reiterated the same monthly wage income and monthly expense, savings, and vehicle information. She stated that she lacked "substantial property or assets" to pay the tax assessments. She also stated:

> "This matter concerns my appeal of an adjustment to my taxes by defendant for the tax year 2013. During the period in question, my income was derived from the ownership and operation of tanning salons ('stores') through Lioness Holdings LLC. Between the final quarter of 2016 and the second quarter of 2017, all of the stores were closed or sold. At this time I do not receive any income from Lioness. Instead, I work for a third party."

On July 23, 2018,[7] taxpayer filed a Second Supplemental Affidavit ("July 23 Statement"). She attached copies of pay stubs and evidence of car payments, as well as a rental agreement for a dwelling.

On April 23, 2019, taxpayer filed a Third Supplemental Affidavit ("April 2019 Statement"). She reported a decline in financial condition: she had sold her vehicle at a loss after it became nondrivable, and she was

---

[7] The court assumes that the June 23, 2018, date indicated by the notary public who witnessed taxpayer's signing is a typographical error and that taxpayer signed the document on July 23, 2018. (The document refers to the June 26 Statement.)

driving a borrowed vehicle. Her monthly wage income had dropped substantially because her "employment was significantly reduced in January, 2019." She reported receiving weekly unemployment insurance benefits. Her monthly expenses continued at approximately the same level.

E.   *The Department's Objections*

The department does not now question taxpayer's income from wages or unemployment insurance benefits, or any of her living expenses. The department's main, continuing objection is that taxpayer has failed to explain what happened to net proceeds in the amount of $610,000 that Lamka allegedly paid or owed to her after she sold him her interest in Lioness Holdings, LLC ("Lioness") in 2015. Taxpayer's 2015 federal income tax return shows clearly that she sold or disposed of Lioness on January 1, 2015, for gross proceeds of $800,000. She reported a basis of $190,000, resulting in gain to taxpayer of $610,000 (which her tax return indicates was more than offset by net operating losses). Taxpayer's tax return preparer, Matthew Green-Hite, testified in a deposition that he prepared documents effecting the sale to Lamka, including a promissory note from Lamka to taxpayer in the amount of $610,000, and that he witnessed Lamka and taxpayer sign the sale documents, except that he did not see whether they signed the note. Taxpayer testified in a deposition that she recalled signing documents transferring her interest in Lioness to Lamka, but she stated: "I mean, I didn't receive any money, per se. You know, there wasn't like a cash transaction." Taxpayer's testimony in the record does not mention a promissory note from Lamka. She testified that her goal in transferring ownership of Lioness was to terminate her authority to sign checks on behalf of the company because there had been "some employee check fraud things going on," and she did not want to be accused of involvement in that. The record does not include any evidence that taxpayer forgave any debt that Lamka owed taxpayer or any evidence that taxpayer treated the debt as a deductible bad or worthless debt. *See* IRC § 166.

There is evidence in the record that Lioness, under Lamka's ownership, was continuing to pursue sources of revenue at the time of taxpayer's various Statements. An

Opinion and Order shows that, as of June 20, 2018, Lioness was the plaintiff in an insurance action in the United States District Court for the District of Oregon, having filed various claims in connection with coverage of employee theft losses. Some of Lioness's claims had survived the defendant's motions and defenses as of that date. In March 2019, Lioness joined with another entity owned by Lamka, Gibraltar Holdings, LLC, in filing a complaint in Multnomah County Circuit Court against Bruce Edwin, LLC and an individual named Lyndsy Nysetvold. The complaint acknowledges that Lioness had "regular and sustained business activities" as late as April 5, 2018, and that Lioness received payments from the defendants through the end of 2018 pursuant to an asset sale agreement. The complaint seeks $400,000 in damages, as well as other relief, based on allegations that the defendants defaulted on the agreement.

Based on taxpayer's federal income tax return for 2015, the court finds that taxpayer sold her interest in Lioness to Lamka in 2015 and realized gross proceeds of $800,000. If for no other reason, this transaction is relevant because these proceeds are many times the annual wage income that taxpayer reported to the court as her sole source of support three and four years later. Based on the testimony of taxpayer's tax return preparer, however, the court finds that taxpayer likely did not receive the proceeds in cash, but instead likely received the bulk of the proceeds in the form of a promissory note from Lamka in the amount of $610,000. The court finds no evidence that taxpayer has since forgiven or written off any debt from Lamka. The court finds further that Lamka was attempting to collect revenue on Lioness's behalf during the period June 2018 through March 2019. From this the court concludes that there was at least some possibility that taxpayer might have been able to collect some amount on the note. This evidence renders not credible taxpayer's representations to this court that no one owes her money.

## V.   CONCLUSION

The court concludes that taxpayer has failed to carry her burden of proving that immediate payment of the assessed tax, interest and penalties would constitute

an undue hardship. The court denies taxpayer's motion and grants taxpayer 30 days from this order to satisfy the assessed tax, interest, and penalties. Now, therefore,

IT IS ORDERED that Plaintiff satisfy the assessed tax, interest, and penalties within 30 days from the date of this order.