566 December 11, 2019 No. 26

IN THE OREGON TAX COURT
REGULAR DIVISION

Peter E. LAMKA
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant.*

(TC 5330)

Plaintiff (taxpayer) made a motion to stay prelitigation payment of his assessed personal income tax based on undue hardship pursuant to ORS 305.419(3). The court, after considering the text, context, and legislative history of ORS 305.419(3), interpreted its ability to grant relief due to "undue hardship." The court found inconsistencies between taxpayer's affidavits to the court and documents he filed with the Internal Revenue Service regarding income, expenses, and the value of assets. The court held that taxpayer did not prove that immediate payment of his assessed personal income tax would constitute undue hardship.

Submitted on Plaintiff's Motion for Stay of Payment of Income Tax, Penalties, and Interest.

John Stuart Jones, Attorney at Law, Salem, filed the motion for Plaintiff.

James C. Wallace, Senior Assistant Attorney General, Department of Justice, Salem, filed the response for Defendant Department of Revenue.

Decision for Defendant rendered December 11, 2019.

**ROBERT T. MANICKE, Judge.**

### I.   INTRODUCTION

This matter is before the court on a motion by Plaintiff Peter E. Lamka (taxpayer) to stay payment of personal income tax pursuant to ORS 305.419(3).[1] Taxpayer filed a supporting affidavit concurrently with his complaint appealing from an adverse decision in the Magistrate Division, where taxpayer challenged assessed deficiencies

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

in personal income tax that Defendant Department of Revenue (the department) asserts now total $67,716.66 and $66,269.42 for 2013 and 2014, respectively.[2] The department initially objected and, after substantial discovery and supplemental filings by both parties, continues to object to a finding of undue hardship.

## II.   ISSUE

Has taxpayer carried his burden of proving that immediate payment of the personal income tax, interest, and penalties assessed would be an undue hardship?

## III.   BACKGROUND

ORS 305.419(1) generally requires payment of any asserted deficiency of net income tax, along with any penalties and interest, on or before the filing of a complaint in this division of the court. However, ORS 305.419(3) provides:

> "Where payment of the tax, penalty and interest would be an *undue hardship*, plaintiff may file an affidavit alleging undue hardship within the time described in subsection (1) of this section. \*\*\* If the tax court finds undue hardship, the tax court judge may stay all or any part of the payment of tax, penalty and interest required under subsection (1) of this section. If the tax court judge finds no undue hardship, the tax court judge may grant the plaintiff up to 30 days from the date of determination to pay the tax, penalty and interest. Failure by the plaintiff to pay the tax, penalty and interest or to establish undue hardship will be cause for dismissing the complaint."

ORS 305.419(3) (emphasis added). Neither this court nor the Oregon Supreme Court has articulated a definition or standards for the application of the statute. Accordingly, this order first considers the meaning of the key phrase "undue hardship," then examines whether taxpayer's initial affidavit supports a conclusion of undue hardship. Finally, the court considers the department's objections and taxpayer's filings in response.

---

[2] Taxpayer claims that the total amount assessed is somewhat less than these amounts. The court finds it unnecessary to resolve the discrepancy for purposes of this opinion.

## IV.   ANALYSIS

### A.   *Text*

The court starts by reviewing the text of the law, its context and its relevant legislative history, to determine the meaning of "undue hardship." *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The tax statutes do not define the phrase; accordingly, the court reviews dictionary definitions as evidence of plain meaning. *See, e.g., Hodges v. Oak Tree Realtors, Inc.*, 363 Or 601, 608, 426 P3d 82 (2018). The phrase was part of the original version of ORS 305.419, enacted in 1982. *See* Or Laws 1982, ch 29, § 2 (HB 3314). That version of subsection (3) provided:

> "Upon a showing of undue hardship by the plaintiff, the tax court may stay all or any part of the payment of tax, penalty and interest required under subsection (1) of this section."

The legislature amended ORS 305.419 in 1985, replacing the entire text of subsection (3) with the following:

> "Where payment of the tax, penalties and interest would be an undue hardship, plaintiff may file an affidavit alleging undue hardship with the complaint. If the tax court finds undue hardship, it may stay all or any part of the payment of tax, penalty and interest required under subsection (1) of this section. If the tax court finds no undue hardship, it may grant the plaintiff up to 30 days from the date of determination to pay the taxes, penalties and interest. Failure by the plaintiff to pay the taxes, penalties and interest or to establish undue hardship will be cause for dismissing the complaint."

Or Laws 1985, ch 407, § 1. Neither the 1985 amendment nor any later amendments have changed the phrase "undue hardship," nor has any version of the statute defined the phrase. The court thus looks to dictionary definitions. *Webster's Third New International Dictionary* does not define the phrase as a whole. It defines "hardship" as "something that causes or entails suffering or privation." *Webster's Third New Int'l Dictionary* 1033 (unabridged ed 2002). "Suffering" is defined as "1: the state or experience of one who suffers: the endurance of or submission to affliction, pain, loss 2: a pain endured or a distress, loss, or injury incurred." *Webster's* at 2284.

"Privation" is defined as "a condition characterized by the loss of something previously or normally possessed." *Id.* at 1805. The word "undue" (apart from its meaning in the context of a debt that is not yet "due") is defined as "unsuited to the time, place, or occasion" or "exceeding or violating propriety or fitness," with synonyms for the latter definition given as "excessive, immoderate, unwarranted." *Id.* at 2492. Similarly, the contemporaneous edition of *Black's Law Dictionary* includes no definition of "undue hardship" but defines "hardship" as "In general, privation, suffering, adversity." *Black's Law Dictionary* 646 (5th ed 1979). *Black's* adds: "As used in zoning statutes as grounds for variance, ["hardship"] refers to the fact that zoning ordinance or restriction as applied to a particular property is unduly oppressive, arbitrary, or confiscatory." *Id. Black's* defines "undue" as "More than necessary; not proper; illegal. It denotes something wrong, according to the standard of morals which the law enforces in relations of men, and in fact illegal *** ." *Id.* at 1370. From these definitions, the court concludes that the plain meaning of "undue hardship" is a loss that involves pain, distress, or injury that is excessive, unwarranted, or arbitrary.

B.   *Context*

The court turns to the context of the "undue hardship" requirement. The court has found no Oregon statutes or administrative rules in existence in 1982 or 1985 that define the term.[3] Nor has the court found contemporaneous Oregon cases articulating specific factors or criteria for a finding of undue hardship in settings involving individuals and purely financial conditions; the limited case law at that time involved substantial nonfinancial issues such as family law or liberty interests.[4]

---

[3] *Cf., e.g., former* ORS 10.050(1) (1985) (allowing excuse from jury service "upon a showing of undue hardship or extreme inconvenience to the person, the person's family, the person's employer or the public served by the person"); *former* ORS 135.050(1)(d) (allowing court-appointed attorney if, among other criteria, "defendant is financially unable to retain adequate representation without substantial hardship in providing necessities to the defendant or the defendant's family").

[4] *Cf. Grove and Grove*, 280 Or 341, 353, 571 P2d 477 (1977) (articulating avoidance of "undue hardship" as one criterion to determine amount of spousal support to award in divorce cases); *State v. Gordon*, 43 Or App 511, 603 P2d 1196 (1979) (applying *former* ORS 130.050(1) (1985)).

Although Oregon income tax law does not generally incorporate procedural provisions of federal income tax law,[5] the court here considers for context any federal tax law definition of the term that might have existed in 1982 or 1985. Section 6161(b)(1) of the Internal Revenue Code allows the Secretary of the Treasury, "[u]nder regulations prescribed by the Secretary," to extend the time to pay an income tax deficiency "only where it is shown to the satisfaction of the Secretary * * * that the payment of a deficiency upon the date fixed for the payment thereof will result in undue hardship to the taxpayer * * *." That language was in place in 1982 and 1985. *See* Internal Revenue Code of 1954, § 6161(b) ("An extension under this subsection may be granted only where it is shown to the satisfaction of the Secretary or his delegate that the payment of a deficiency upon the date fixed for the payment thereof will result in undue hardship * * *."). A corresponding federal Treasury regulation, also in place at that time, states:

> "The term 'undue hardship' means more than an inconvenience to the taxpayer. It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer from making payment on the due date of the amount with respect to which the extension is desired. If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship."

Treas Reg § 1.6161-1(b); *see* Treasury Decision 6364 (Feb 13, 1959) (adopting quoted text). This context, though limited, indicates that the Internal Revenue Service required a taxpayer to show "substantial" financial loss in order to defer payment of an income tax deficiency. Having to sell property to pay the tax would not suffice, unless there was no market for the property and the taxpayer had to sell the property at a "sacrifice price."

Federal bankruptcy law in place in 1982 and 1985 required courts to determine whether to discharge an individual debtor from student loan debt based on an "undue hardship on the debtor and the debtor's dependents." 11 USC

---

[5] *See Allison v. Dept. of Rev.*, 11 OTR 431, 434-35 (1990) ("Oregon has its own administrative provisions * * *.").

§ 523(a)(8)(B). Courts often looked for guidance to a 1973 Congressional report, which suggested that courts consider whether, upon review of present and anticipated earnings and unearned income or wealth, the debtor and dependents could "maintain *** a minimal standard of living within their management capability, as well as *** pay the educational debt." Communication from the Executive Director, Commission on the Bankruptcy Laws of the United States, HR Doc No 93-137, 93d Cong, 1st Sess, Pt II at 140-41 (1973); *see also In re Bagley*, 4 BR 248, 6 BCD 404, 405 (D Ariz 1980).

Based on this review of materials available to the Oregon legislature in 1982 and 1985, the court concludes that the Oregon legislature was aware of a range of circumstances that might constitute an undue hardship, from inability to maintain a minimal standard of living, to the excessive loss caused by having to sell property at a distress sale price.

C.  *Legislative History*

The court turns to a review of the legislative history of the 1982 and 1985 statutes. The court has found nothing from which it can infer any standards for the court to apply. In fact, the department's representative at the 1982 special session House Revenue Committee hearings, Elizabeth Stockdale,[6] testified that "there are no standards in the bill to guide the court in determining whether there is an undue hardship, so the court's going to have freedom and discretion to look at all the circumstances that affect that particular taxpayer and make a determination on those facts ***." Tape Recording, House Committee on Revenue, HB 3314, Feb 18, 1982, Tape 46, Side B, (testimony of Elizabeth Stockdale).[7] The 1982 bill was one of a set of budgetary proposals that Governor Atiyeh asked the legislature to consider in a special session to address a projected state budget shortfall of $99.8 million. *Id.*, Tape 46, Side A (testimony of Jon Yunker, State Budget Director). Much of the discussion

---

[6] Stockdale represented the department as an attorney for the Department of Justice and later became the department's director.

[7] Stockdale was responding to a comment by the Chair of the House Revenue Committee that "I don't know what standards a court would apply" to determine a hardship. *Id.* (statement of Rep Powell).

and testimony about the tax prepayment proposal involved the amount of revenue that would be recovered on an accelerated basis by requiring taxpayers to pay the assessment at the beginning of litigation in this court, as opposed to only at the end of unsuccessful litigation, including appeal to the Oregon Supreme Court. The accelerated revenue amounted to about $8 million, or about eight percent of the Governor's total proposal. *See id.*, Tape 46, Sides A & B. The chair of the House Revenue Committee expressed concern about the potential to chill a taxpayer's appeal rights and asked Stockdale whether a prepayment requirement would be constitutional. *Id.*, Tape 46, Side B. Stockdale responded that a body of case law from other states supported the validity of the requirement. *Id.* One senator inquired about taxpayers' ability to claim hardship relief solely to delay payment or to manipulate the then-existing interest rate difference as between tax refunds and tax assessments, and asked whether a mechanism could be devised to reduce that risk. Stockdale responded that devising such a mechanism would be difficult. *Id.*, Tape 31, Side A; Tape 30, Side B.

The 1985 replacement of ORS 305.419(3) apparently arose because Tax Court Judge Carl Byers observed that the 1982 provision arguably required the court to determine whether an undue hardship existed before a taxpayer's complaint could be filed. Given the short deadlines to file a tax complaint, Judge Byers was concerned that even a brief time for court review could jeopardize the timeliness of otherwise timely complaints. He therefore drafted new suggested language for subsection (3), which ultimately became the only surviving portion of a larger procedural bill. Tape Recording, Senate Committee on Revenue and School Finance, SB 186, May 1, 1985, Tape 163, Side A, (testimony of Hon Carl Byers); *see* Or Laws 1985, ch 407, § 1; SB 186. The legislative history of the 1985 bill restating the phrase "undue hardship" gives no indication that the legislature intended to change the meaning of the phrase or to add any standards. In fact, Judge Byers testified that taxpayers generally do not know what constitutes an undue hardship. *See* Tape Recording, Senate Committee on Revenue and School Finance, SB 186, May 1, 1985, Tape 163, Side A. A business lobbyist urged the committee to reverse course and eliminate the prepayment

requirement altogether, noting that the immediate fiscal crisis that prompted the 1982 requirement had passed. There was minimal discussion of the consequences of thus "re-deferring" revenue, and no legislator proposed an amendment to do so. *Id.* (statement of Gary Carlson, Associated Oregon Industries).

Based on its review of the text, context and legislative history of ORS 305.419(3), the court concludes that the legislature in 1982 and 1985 viewed the prepayment requirement as an important source of immediate revenue, any undoing of which would incur at least a short-term cost. The legislature decided to create only one basis for relief from the prepayment requirement, and to vest the court with discretion to administer that relief. Although the legislature adopted the undue hardship criterion without any stated standard, the court infers from the text and context of the law that the legislature certainly intended the court to grant hardship relief where immediate payment of the tax would prevent a taxpayer from maintaining a minimal standard of living. Furthermore, the legislature authorized the court to consider other potential factors, such as an excessive, permanent loss that would be caused when a taxpayer would have to sell off property at a distress sale price. Implicitly, by using the word "undue," the legislature also authorized the court to weigh the public policy of ensuring public access to an appeal against the public benefit of an immediate collection (and elimination of the corresponding risk of abuse by taxpayers seeking primarily to delay).

D.   *Taxpayer's Affidavit and Supplemental Sworn Statements*

The court turns to taxpayer's first affidavit, which he signed on June 8, 2018, by answering questions on a form provided by the court ("June 8 Statement"). Under penalty of perjury, taxpayer stated that he was not employed and listed "N/A" in the space provided for his past employment history. He received income from "consulting" in the amount of $4,000, on a basis he described as "intermittently-monthly." He received no help with expenses from any family member, and no one owed him money. He had no cash or bank accounts, no vehicle, and no other property except a house in Portland, which he valued at $680,000 "at last appraisal,"

and on which he owed $740,000. Taxpayer's monthly living expenses added up to $3,956, including "rent/mortgage" of $2,936 and $200 for "utilities," leaving net monthly income of $44. Solely based on a review of the June 8 Statement, the court would seriously consider granting taxpayer's motion on the grounds that enforcing the prepayment requirement would work an undue hardship on taxpayer. Taxpayer stated that he has no liquid assets to pay the more than $130,000 in combined assessments. Taxpayer owned a valuable asset, the Portland house, but the house secured debt well in excess of its value, and the record does not indicate whether the tax debt would take priority in a sale.

The June 8 Statement is far from the end of the story, however. The department has made document requests, taken depositions and scrutinized other information available to it. Taxpayer has supplemented the June 8 Statement multiple times in an attempt to address the department's objections.

Taxpayer's second statement under penalty of perjury is his Supplemental Declaration filed June 26, 2018 ("June 26 Statement"). He there declared:

> "This matter concerns my appeal of a [*sic*] adjustments to my taxes by defendant for the tax years 2013 and 2014. During the period in question, most of my Income was derived from transactions with Lioness Holdings LLC, which owned and operated tanning salons. Between the final quarter of 2016 and the second quarter of 2017, all of the stores were closed or sold. Licensing and leasing revenue from Lioness Holdings to and through my pass through entitles Gibraltar Holdings LLC and Pathos LLC thereafter ceased."

Taxpayer also stated:

> "My current monthly income from consulting is $4000, paid intermittently but approximately monthly. My expenses are $3956 per month. *** I do not have savings, and do not have substantial property or assets available to pay my outstanding tax assessments."

On July 23, 2018, taxpayer signed a Second Supplemental Affidavit ("July 23 Statement"), incorporating the June 26 Statement and stating in part:

"[T]he tanning businesses that are the original source of the income at issue are not operating. Tan Republic, dba Lioness Holdings LLC, Gibraltar Holding LLC, and Pathos Holding LLC are no longer in the retail or tanning business. *** Neither Peter Lamka or Ariel Peterson[8] *** have owned or operated any of the tanning salons since 2017.

"* * * * *

"I reside outside of the United States for more than six months each year. As a result, I do not have regular US employment. I do receive consulting payments regarding the operation of Lioness Holding LLC. Attached here as Exhibit 2 are cover sheets for Lioness Holdings, LLC bank account statements for the several months. This account is used to wrap up the businesses and to pay my consulting fees. The intermittent payments are in varying amounts. which I referred to in my original Affidavit in Support of Motion for Stay ('intermittent-> monthly'). Over the past six month period *** the transactions average approximately $4500 per month. Of that approximately $4000/month can be attributed to compensation for my consulting."

On January 10, 2019, taxpayer, through counsel, sent to the department's counsel an email "explanation *** with regard to the business activities of Lioness Holdings LLC and Gibraltar Holdings LLC from 2016 forward" ("January 10, 2019, Statement"). Among other things, this email states:

"Gibraltar's cash flow has been from consulting on various business ventures with completely unrelated business owners in other parts of the country and globe, liquidating and scrapping the remaining Lioness/Gibraltar equipment for pennies on the dollar (using the 2017 independent US Bank appraisal as a barometer for true value, it was pennies on the dollar, as the appraiser in 2017 valued the equipment at nearly $1.9M), and working to start a new revenue stream for Gibraltar in the midst of this chaos, so I can eat and have a roof over my head."

On January 31, 2019, taxpayer's counsel sent to the department's counsel an email ("January 31, 2019,

---

[8] Peterson, a business associate of taxpayer, has filed a separate personal income tax appeal and claim for undue hardship relief. *See Peterson v. Dept. of Rev.*, 23 OTR 554 (2019), which the court also issues today.

Statement") relaying taxpayer's explanation that certain amounts taxpayer reported as "consulting" payments in taxpayer's prior Statements were actually "payments for the aborted sale of Lioness in 2017 or thereabouts."

On April 23, 2019, taxpayer signed a Third Supplemental Affidavit ("April 2019 Statement"), incorporating the June 26 and July 23 Statements and adding:

> "My monthly income and expenses continue to be as I stated in my prior Affidavits. * * * I also have an IRS employment tax liability in the amount of approximately $1,030,000, including a trust fund penalty assessed against me personally, which amounts are in 'currently not collectible' status."

E.   *The Department's Objections*

In seeking to overcome the department's objections, taxpayer bears the burden of proving that hardship relief is appropriate, and the court now weighs the record to determine whether taxpayer has carried that burden. *See* ORS 305.427 (burden of proof is on party seeking affirmative relief "in all proceedings" before the court).

The department's main allegation[9] is that taxpayer has failed to disclose income streams, mischaracterized the source of his monthly income, and declared substantially higher amounts of income to the Internal Revenue Service, all of which impair the credibility of his Statements to such an extent that taxpayer has failed to carry his burden of proof. In his June 8 Statement, responding to a question on the court's form, taxpayer identified the source of his monthly income as "consulting" services. Taxpayer repeated that characterization in his next three Statements. In the January 31, 2019, Statement, however, taxpayer claimed that the source of his monthly income is proceeds from a 2017 sale of the tanning business to a company owned by a former employee, Patrick McNeill. The department has

---

[9] The department also alleges that taxpayer has failed to prove that his real estate is worth only $680,000, as the county assessor has assigned the property a real market value of more than $1.2 million. On this point, taxpayer has maintained a fairly consistent position and has produced an appraisal report dated October 12, 2014, showing an "as is" appraised value of $481,000 and an "as repaired" value of $626,400. The court makes no finding as to the actual value of the property.

produced evidence indicating that neither explanation accurately describes how taxpayer earns the income. A declaration by McNeill suggests that payments for the 2017 sale ended no later than February 2018, when McNeill's lawyers sent taxpayer a demand letter seeking the return of all monies paid to date and alleging that taxpayer had committed fraud in the transaction. Also, two additional declarants (Gary Sommer and Lyndsy Nysetvold) claimed that taxpayer had sold each of them the assets of separate salons in exchange for monthly payments totaling about $3,000. Those payments started in April 2018 and ended in January 2019, when each declarant ceased making payments on the ground that taxpayer had induced the transaction by fraud.[10] Taxpayer has not rebutted any of this evidence. The court finds taxpayer's Statements regarding the source of his income not credible.

Even more confounding are two documents that taxpayer filed with the Internal Revenue Service around the time of his June 8 Statement. The first is a Form 433A,[11] which taxpayer signed on April 3, 2018. That document, signed under penalty of perjury, reports $9,700 in gross monthly income, all of which comes from "partnerships," and $9,061 in total living expenses, of which $8,153 is for "housing and utilities." The second is a Form 433-A (OIC),[12] which taxpayer signed on September 13, 2018, likewise under penalty of perjury. The latter document shows monthly income of $8,158, entirely from partnership distributions, and monthly expenses of $8,746, of which "housing and utilities" make up $7,241. Obviously, these income amounts are more than double the amounts that taxpayer repeatedly has represented to this court and to the department. Likewise,

---

[10] The Sommer and Nysetvold declarations also undermine taxpayer's July 23 Statement that "[T]he tanning businesses that are the original source of the income at issue are not operating," as both declarants assert that they made payments on taxpayer's behalf on "accrued" rent obligations owed by taxpayer.

[11] See IRS Pub 1854, "How to prepare a Collection Information Statement" (rev 3-2019) ("Form 433-A is used to obtain current financial information necessary for determining how a wage earner or self-employed individual can satisfy an outstanding tax liability.").

[12] See IRS Form 656 Booklet, "Offer in Compromise" (rev 8-2019) at 4 (a taxpayer must file Form 433-A (OIC) to apply for an offer from Internal Revenue Service to compromise an outstanding federal tax liability).

the line items for housing and utilities are twice what taxpayer claimed on his Statements. The court recognizes that its form of affidavit differs from the forms of the Internal Revenue Service, but all three sets of forms ask for explanation of "other" categories of income and expenses. Taxpayer has not explained the dramatic differences in the amounts he reported.[13] The court finds taxpayer's Statements regarding the amounts of his income and living expenses not credible.

In a supplemental response dated August 2, 2019, the department filed a copy of a complaint in Multnomah County Circuit Court by Lioness Holdings, LLC ("Lioness") and Gibraltar Holdings, LLC ("Gibraltar"), seeking $400,000 in damages and other relief from Nysetvold and the company of which she is a member. Among other things, the complaint acknowledges that Lioness and Gibraltar sold assets to the defendants in April 2018 and that the defendants made payments to Lioness and Gibraltar until January 2019, including payments on a promissory note to the plaintiff companies. Read together with taxpayer's June 23 and July 26 Statements that he receives "pass-through" income from Gibraltar and other income from Lioness, the complaint undermines the credibility of his June 8 Statement that he has no "money owed to you by others."

## V.   CONCLUSION

The court concludes that taxpayer has failed to carry his burden of proving that immediate payment of the assessed tax, interest, and penalties would constitute an undue hardship. The court denies taxpayer's motion and grants taxpayer 30 days from this order to satisfy the assessed tax, interest, and penalties. Now, therefore,

IT IS ORDERED that Plaintiff satisfy the assessed tax, interest, and penalties within 30 days from the date of this order.

---

[13] Taxpayer also disclosed to the Internal Revenue Service a vehicle, of minor value, not listed on taxpayer's Statements to this court.